# Exhibit 1, Part 4

ultimately, Black Square Ltd; and (2) loaned the same DKK 2,341,220,424 worth of Novo Nordisk shares to, ultimately, Black Square Ltd in a closed loop circular fashion. There appears to be no legitimate business reason for the stock loans to take place in three simultaneous steps, from the Loggerhead Plan, to Neoteric Limited, to Relative Value Trading, and then to Black Square, other than to disguise through a complex series of paper transactions the fact that it is the Loggerhead Plan that is loaning to Black Square the very shares that Black Square is purportedly selling to the Loggerhead Plan.[247]

194. This circular trading pattern is no different than the circular loop involved in the Bernina Plan's trades, other than that Solo Capital inserted an additional layer of transactions to both the purchase/sale legs and the stock loan legs of the loop.



Figure 28 – The Loggerhead Plan Solo Trade

---

[247] I noted that 112 Plans purportedly traded, in aggregate, 713.4 million shares of Novo Nordisk stock on March 19, 2015, representing a total market value of approximately DKK 243,917,425,471 (or USD $34.8 billion). I reviewed the Plans trading data for every purported transaction related to Novo Nordisk stock on March 19, 2015 and concluded that they all followed the same steps, and had the same circular trading pattern, as described in the sample Novo Nordisk transaction purportedly executed by the Loggerhead Plan.

CONFIDENTIAL
Expert Report of Bruce G. Dubinsky
December 31, 2021
Page 72

      g.    **The Loggerhead Plan submits a dividend WHT reclaim request to SKAT**

195. Acupay submitted the reclaim request to SKAT on behalf of the Loggerhead Plan.[248] The reclaim request package included a "Dividend Credit Advice" from Solo Capital representing that the Loggerhead Plan owned the 6,847,646 shares in Novo Nordisk described above and received a dividend on those shares net of withholding tax.

---

[248] SKAT_MDL_001_00060764-769.

CONFIDENTIAL
Expert Report of Bruce G. Dubinsky
December 31, 2021
Page 73



Figure 29 – Dividend Credit Advice[249]

196. Solo Capital then unwound the transaction by purportedly selling the Novo Nordisk shares it held and closing out the loan agreement.

197. In the end, there was no movement of cash or delivery of securities. The purported transactions were simply reversed, leaving only a paper trail to support the reclaim

---

[249] SKAT_MDL_001_00060764-769.

application. I have seen no evidence that any of the parties to this transaction loop ever actually owned shares in—or ever received a dividend payment from—Novo Nordisk. As such, I concluded that the entire trading loop was fictitious.



Figure 30 – The Loggerhead Plan Solo Trade

**D.     The Solo Trades in the 15 Bellwether cases all follow a similar trading pattern as compared to the sample simple loop transaction purportedly executed by the Bernina Plan and the sample complex loop transaction purportedly executed by the Loggerhead Plan (as discussed in detail above)**

198.   As discussed above, I reviewed the trade confirmations and other documentation related to all 2,559 of the Solo Trades purportedly orchestrated by Solo Capital on behalf of the Plans. Based on this review, I concluded that each of the purported Solo Trades followed a similar purported trading pattern as compared to the sample simple loop transaction purportedly executed by the Bernina Plan and the sample complex loop transaction purportedly executed by the Loggerhead Plan, and as such, I have concluded that in all 2,559

Solo Trades, the Plans never purchased actual Danish securities.[250]

### 1. Example #1: The purported purchase of DKK 659.3 million worth of stock in A.P. Moller Maersk A/S – B in March 2015

199. Another example of the Solo Trades that I reviewed was related to the purported purchase of shares in A.P. Moller Maersk A/S – B by the Roadcraft Plan in March 2015. This purported transaction is an exact replica of Step 1c of the Loggerhead example discussed above and is one leg of a circular transaction loop that is an exact replica of a complex loop as described above.

---

[250] Unlike the Loggerhead Novo Nordisk example used here, some of the loop transactions involved the "bundling" of shares at certain steps of the loop. For instance, on March 18, 2014, the Bernina Plan purported to purchase 4,270,392 shares of Danske Bank A/S stock using Novus ("Novus") Capital Markets Limited as a broker. ELYSIUM-02861054. Novus had purportedly sourced those shares from another broker, Bastion Capital London Limited ("Bastion"), but unlike in the Loggerhead example, this purported trade was for 112,687,781 shares, which included the 4,270,392 shares purportedly purchased by the Bernina Plan. ELYSIUM-02860996. Bastion had purportedly sourced these shares from four separate short sellers, in lots of 25,839,592 (ELYSIUM-02860957), 29,731,152 (ELYSIUM-02861022), 26,926,511 (ELYSIUM-02861227), and 30,190,526 (ELYSIUM-02861228). The last of these short sellers was Aronex Partners Ltd. ELYSIUM-02861228. (The remainder of these 112,687,781 were purportedly purchased by other U.S. Plans.)

The Bernina Plan's loan of the 4,270,392 shares was not bundled. It loaned the shares to Colbrook Limited (ELYSIUM-02896979), which loaned them to Rock Capital Private Fund Limited (ELYSIUM-02897325), which loaned them to Aronex Partners Ltd (ELYSIUM-02897273). Thus, although the Bernina Plan's purported purchases in the equity portion of the loop were aggregated with other plans' purported purchases, the shares that Bernina Plan purportedly purchased were still loaned out to the same party who had purportedly sold them (Aronex Partners Ltd). This bundling of shares into larger tranches through the broker intermediaries and from the ultimate short-sellers, and the allocation of those shares into smaller amounts among groups of Plans, further demonstrates the extensive pre-arranged coordination of the Solo Trades by Solo Capital and the various counterparties, and further supports my conclusion that the Solo Trades were fictitious, circular loops in which no real shares or money ever existed.



**Figure 31 – Trade Confirmation from Solo Capital to the Roadcraft Plan**

200. I have performed an extensive review of the documents related to each step of this transaction and have seen no evidence that (1) these shares were held at any of Solo Capital's custodians or sub-custodians; (2) the Roadcraft Plan had access to DKK 659.3 million—or approximately USD $96.1 million—of liquidity or real credit to execute this transaction; or (3) any cash was paid by the Roadcraft Plan or shares delivered related to this purported transaction. Accordingly, this further underscores my conclusion that the Solo Trades were fabricated by Solo Capital in a cookie-cutter approach and involved no actual Danish securities.

    **2.    Example #2: The purported stock loan of DKK 630.8 million worth of shares in A.P. Moller Maersk A/S – A in April 2015**

201. A second example of a Solo Trade that I reviewed was related to the purported stock loan of shares in A.P. Moller Maersk A/S – A by the FWC Plan in April 2015. This purported

CONFIDENTIAL
Expert Report of Bruce G. Dubinsky
December 31, 2021
Page 77

transaction is an exact replica of Step 3a of the Loggerhead example discussed above and is one leg in a circular trading loop that is an exact replica of a complex loop as described above.

**To:** trading@fwccap.com[trading@fwccap.com]
**Cc:** martin.smith@colbrooklimited.com[martin.smith@colbrooklimited.com]; alex.smith@colbrooklimited.com[alex.smith@colbrooklimited.com]; solotradeapprovals@solo.com[solotradeapprovals@solo.com]
**From:** solotradeapprovals@solo.com[solotradeapprovals@solo.com]
**Sent:** Wed 01-04-2015 15:46:57 (UTC)
**Subject:** Account (FWC01) - trade approved

Dear Client,

Please accept this email as confirmation that the below stock loan transaction has been approved and booked to your Solo Capital Partners LLP custody account.

In case of any queries, please contact custody@solo.com.

Global Securities Services

**Solo Capital Partners LLP**

Details of Stock Loan Transaction:

| | |
|---|---|
| Client Account | FWC01 |
| Counterparty | Colbrook Limited |
| Trade Type | Lend |
| Ticker | MAERSKA |
| Product (Instrument) | Stock Loan (Equity) |
| Currency | DKK |
| Price | 15,810.0000 |
| Quantity/Contracts | 39,897 |
| Shapes | Shape 1 39,897 |
| Notional | 630,771,570.00 |
| Trade Date | 01 April 2015 |
| Settlement Date | 07 April 2015 |
| Haircut | 0 |
| Term | Open |
| Interest Rate Type | Fixed |
| Interest Rate | 70.0000 |
| Lending Fee Rate | 87.5968 |
| Cash Pool Type | Fixed |
| Dividends | 100% |

Client: The FWC Capital LLC Pension Plan
Counterparty: Colbrook Limited
Trade Type: Stock Loan
Ticker: MAERSKA
Instrument: Equity
Quantity: 39,897 shares
Price: DKK 15,810.0000
Notional: DKK 630,771,570.00
Trade Date: April 1, 2015
Settlement Date: April 7, 2015

**Figure 32 – Stock Loan Confirmation from Solo Capital to the FWC Plan**

202.  Additionally, similar to the Loggerhead example, the stock price that the loan agreement was premised on (DKK 15,810.00) was the price that the FWC Plan had purchased the shares at several days prior (on March 30, 2015), rather than the market price as of the date of the

stock loan on April 1, 2015.[251]

203. Furthermore, I have seen no evidence that (1) any cash collateral was paid or securities delivered; or (2) any mark-to-market calculations on the value of the loaned shares were performed. Once again, this further supports my conclusion that the Solo Trades were fake.

### E. Solo Capital pre-arranged the entire structure of the transactions to the Plans and the Plans had no ability to negotiate the financial terms of the arrangement

204. As a starting point, Solo Capital maintained a list of publicly traded Danish stocks that were scheduled to declare a dividend payment to its shareholders of record as of a specific date in the future.[252]

205. From this list, Solo Capital provided detailed trading instructions to those involved in executing the Solo Trades for the Plans. Specifically, Solo Capital selected the particular stock or security that was purportedly going to be "traded," the allocation of shares to each Plan, and information related to which broker and other counterparties would be used for the hedging and stock loan transactions.[253] I reviewed spreadsheets that were used by Solo Capital to slice up the Solo Trades and dole out portions to the various Plans. In other words, it wasn't the Plans that were dictating how much to purchase or when to do so, nor was it the brokers who were seeking liquidity in the market to fill the Plans' trade orders, but rather Solo Capital was the one who was dictating and pre-arranging each leg of the circular loops.

206. Additionally, Klugman provided an email to certain traders that supposedly acted on behalf of the Plans.[254] The subject line of the email was titled "Arbitrage instructions and questions" and contained step-by-step guidance to the traders regarding how to execute the purported trades on behalf of the Plans.[255] Based on these instructions, the traders were directed to perform a series of steps for each of the Solo Trades, which boiled down to the "traders" sending pro forma emails to create a paper record of trade orders.

207. For example, at around 7am on the "Trading Day" the traders were instructed to request

---

[251] ELYSIUM-04034158.
[252] Deposition of Richard Markowitz, Vol. 2, 411:22-415:8.
[253] Deposition of Richard Markowitz, Vol. 2, 417:2-428:9.
[254] Klugman Exhibit 1777.
[255] Deposition of Richard Markowitz, Vol. 2, 408:22-410:9.

CONFIDENTIAL
Expert Report of Bruce G. Dubinsky
December 31, 2021
Page 79

liquidity from a broker (identified by Solo Capital) using 34 separate emails—one for each of the 34 pension plans that were participating in this structure.[256] The issuing of 34 emails all at once for the 34 Plans shows the pre-arranged bulk nature of the Solo Trades. Further, the fact that 34 Plans in this example were participating in this one transaction also shows that the transactions were not custom tailored to each Plan based upon their own risk profile, investment strategy or time horizon, but rather the transactions were simply carved up and doled out to each Plan by Solo Capital.

**Trading Day**
1) Around 7am, request for liquidity (34 emails)
   a. Response will take 10 minutes to 1 hour

Good Morning – hope all is well.

Pursuant to Section 3.3(a) of the Guarantee Deed among Solo Capital Partners LLP, California Catalog Company Pension Plan and NOVUS CAPITAL

California Catalog Company Pension Plan – Account CAL01 – hereby seeks liquidity for the following transactions:

- BUY CASH EQUITITES
- ISSUER NAME – DANSKE BANK A/S
- ISIN – DK0010274414
- SHARES – 4,102,943
- PRICE – End of Day
- TRADE DATE – 18 March 2014
- SETTLEMENT DATE/STOCK PURCHASE VALUE DATE – 24 March 2014
- BROKER – NOVUS CAPITAL

Please contact us to confirm what you are seeing and if you have liquidity to offer.

Figure 33 – Trading Instructions[257]

208. After the initial request for liquidity, step 2 in the guidelines indicates that the broker "responds back via email and say will seek liquidity" [SIC] and "get custodian approval (34 emails)."[258] Next, step 3 in the process instructs the pension plan's representative to respond

---

[256] Deposition of Richard Markowitz, Vol. 2, 411:5-412:11.
[257] Klugman Exhibit 1777.
[258] Klugman Exhibit 1777.