# Exhibit 19 Part 3

## SCHEDULE 2 (CLIENT CLASSIFICATION)

**Client Classification Notification**

Following the implementation of the Markets in Financial Instruments Directive ("MiFID") in the UK which came into effect on 1 November 2007, the Custodian is required to classify clients into one of three categories. For the purpose of FCA rules, the Custodian will categorise you as an "Eligible Counterparty", a "Professional Client" or a "Retail Client". However, in some cases (that is, if you do not meet the required profile), you will need to be reassessed for eligibility into another category. In such cases, it may be necessary for your status to be "opted up". This may result in the loss of certain protections under the regulatory system.

**Disclosures**

If you are designated as a "Professional Client" or "Eligible Counterparty", you will be given less disclosure with regard to the Custodian and the Custodian's services (for example in relation to our fees and charges, information on the nature of our reporting to you and information regarding the safeguarding of investments and money held for you).

**Appropriateness**

The Custodian will be entitled to assume that you have the necessary level of experience and knowledge to understand the risks involved in relation to any investment, product or transaction and will not be required to determine that such investments, products or transactions are appropriate for you.

**Periodic Statements**

If requested the Custodian will provide periodic statements every six months to you.

**Client Money**

If the Custodian is holding money on your behalf the Custodian will not have to notify you whether interest is payable and the Custodian will be able to transfer money to a third party without notifying you nor explain who is responsible for that third party's actions or omissions or the consequences of the failure of that third party.

**Complaints**
Should you be dissatisfied with the handling of the dispute, you may have the right to refer the matter to the Financial Ombudsman Service.

**Financial Services Compensation Scheme**
The Custodian is a member of the FSCS. The FSCS is only available to certain types of claimants and claims, and payments to eligible claimants under the FSCS will vary depending on the type of protected claim the claimant makes in respect of the relevant institution. Payments under the FSCS in respect of investment business are subject to a maximum of payment to any eligible claimant of GBP 50,000. Further details on the FSCS are available at www.fscs.org.uk.



CONFIDENTIAL JHVM_0004757

**SCHEDULE 3**
**PRICING SCHEDULE**

(A) You agree to immediately pay the Custodian any Fees when due and payable, in accordance with this Agreement and the table set out below (as applicable, and unless otherwise notified to you) for the provision of the services of the Custodian under these Terms:

| Custody, Platform and Clearing Fees | EUR € 10,000 per month |
|---|---|
| Stock Loan/ Forward Intermediaries | EUR € 2,500 per month |

(B) The Custodian may decrease or increase the Fees in the above table from time to time and the Custodian will notify you of such change.

(C) The Custodian reserves, upon notification, the right to pass through to you any additional costs including, without limitation, any tax or administrative add-on that may be incurred as part of the provision of the services under these Terms including but not limited to any costs relating to an service provider.

(D) The Custodian reserves the right to amend the Fees detailed in this Schedule from time to time. The Custodian will notify you immediately if such change of Fees occurs.

(E) Any matured amount owed to the Custodian by you under Clause 19 of these Terms may be set-off against any amount held by the Custodian on behalf of you Client (irrespective of the currency, place of payment or booking office of the obligation). If the obligations are in different currencies, the Custodian may convert either obligation at a market rate of exchange in its usual course of business for the purpose of set off.

**SCHEDULE 4**
**TRADE REPORTING NOTICE**

[TO BE INSERTED ON CLIENT HEADED PAPER]

Global Securities Services
Old Park Lane Capital PLC ("**Custodian**")
49 Berkeley Square
London W1J 5AZ

[DATE]

Dear Sirs,

**TRADE REPORTING CONFIRMATION NOTICE**

Terms defined in the Custodian's terms and conditions (as amended from time to time) ("**Terms**") shall, unless otherwise defined in this notice or unless a contrary intention appears, bear the same meaning when used in this notice.

Pursuant to clause 14 (Trade Reporting) of the Terms, we hereby notify you that we would like the Custodian to assist with our trade reporting obligations required pursuant to EMIR.

We agree and acknowledge that (a) the Custodian may appoint a service provider to assist with the Trade Reporting and (b) Trade Reporting shall be restricted and limited to:

(i) the Custodian reporting Counterparty Data and Common Data to a trade repository in accordance with the terms and conditions of EMIR;

(ii) derivative contracts entered into by us as counterparty only in accordance with these Terms;

(iii) sending one report to the trade repository containing the relevant required Counterparty Data and Common Data; and

(iv) starting at such time as the reporting obligation for such class of derivative contract comes into force pursuant to EMIR,

and Trade Reporting may include if and when required by applicable rules (and if permitted to be delegated to the Custodian or a service provider by us) contract and collateral valuation data.

Trade Reporting undertaken by the Custodian or any service provider shall be subject to us providing the Custodian or any service provider with such information promptly as is necessary in order for the Custodian or service provider to assist with the Trade Reporting. Trade Reporting shall be agreed as early as practicably possible before Trade Reporting is required to be reported.

We agree and acknowledge that the Custodian does not charge for Trade Reporting, however this may change in the future.

Yours sincerely,

……………………………………………………
**[●]**

**SCHEDULE 5**
**RISK FACTORS**

**The Nature & Risk of Designated Investments**

This Schedule is intended to give you, in your category as a retail or a professional client, information on, and a warning of, the risks associated with designated investments so that you are reasonably able to understand the nature and risks of the services and of the specific types of investment being offered and, consequently, to take investment decisions on an informed basis. The Schedule does not purport to disclose all of the risks and other significant aspects of investment products and services. Please note that this Schedule includes, for your convenience, information on some designated investments which are not covered by OPL's FCA regulatory permissions.

You must not rely on the guidance contained in this Schedule as investment advice based on your personal circumstances, nor as a recommendation to enter into any of the services or invest in any of the products listed below. Where you are unclear as to the meaning of any of the disclosures or warnings described below, we would strongly recommend that you seek independent legal or financial advice.

You should not deal in these or other products unless you understand the nature of the contract you are entering into and the extent of your exposure to risk. You should also be satisfied that the product and/or service is suitable for you in light of your circumstances and financial position and, where necessary, you should seek appropriate independent advice in advance of any investment decisions.

Risk factors may occur simultaneously and/or may compound each other resulting in an unpredictable effect on the value of any investment.

All financial products carry a certain degree of risk and even low risk investment strategies contain an element of uncertainty. The types of risk that might be of concern will depend on various matters, including but not limited to how the instrument is created or drafted. Different instruments involve different levels of exposure to risk and in deciding whether to trade in such instruments or become involved in any financial products you should be aware of the guidance set out below.

The value of investments and the income from them can fall as well as rise and you might not get back the original amount invested. This can result from market movements and also from variations in exchange rates between sterling and the currency in which a particular investment is denominated. Past performance is not a reliable indicator of future results.

**Part II: Products and Investments**

Set out below is an outline of the major risks that may be associated with certain generic types of Financial Instruments, which should be read in conjunction with Parts III and IV.

**1. Shares and Other Types of Equity Instruments**

**1.1 General**

A risk with an equity investment is that the company must both grow in value and, if it elects to pay dividends to its shareholders, make adequate dividend payments or the share price may fall. If the share price falls, the company, if listed or traded on-exchange, may then find it difficult to raise further capital to finance the business, and the company's performance may deteriorate vis à vis its competitors, leading to further reductions in the share price. Ultimately the company may become vulnerable to a takeover or may fail.

Shares have exposure to all the major risk types referred to in Part III below. In addition, there is a risk that there could be problems in the sector that the company is in. In addition, if the Company is private, i.e. not listed or traded on an exchange, or is listed but only traded infrequently, there may also be a certain amount of liquidity risk, whereby shares could become very difficult to dispose of.

**1.2 Ordinary Shares**

Ordinary shares are issued by limited liability companies as the primary means of raising risk capital. The issuer has no obligation to repay the original cost of the share, or the capital, to the shareholder until the issuer is wound up (in other words, the issuer company ceases to exist). In return for the capital investment in the share, the issuer may make discretionary dividend payments to shareholders which could take the form of cash or additional shares.

Ordinary shares usually carry a right to vote at general meetings of the issuer.

There is no guaranteed return on an investment in ordinary shares for the reasons set out in 1.1 above and upon a liquidation of the issuer ordinary shareholders are amongst the last who have a right to repayment of their capital and any surplus funds of the issuer, which could lead to a loss of a substantial proportion, or all, of the original investment.

**1.3 Preference Shares**

Unlike ordinary shares, preference shares give shareholders the right to a fixed dividend, the calculation of which is not based on the success of the issuer company. They therefore tend to be a less risky form of investment than ordinary.

Preference shares do not usually give shareholders the right to vote at general meetings of the issuer, but shareholders will have a greater preference to any surplus funds of the issuer than ordinary shareholders, should the issuer go into liquidation.

**1.4 Depositary Receipts**

Depositary Receipts (ADRs, BDRs, etc.) are negotiable certificates typically issued by a bank which represents a specific number of shares in a company, traded on a stock exchange which is local or overseas to the issuer of the Receipt. They may facilitate investment in the companies due to the widespread availability of price information, lower transaction costs and timely dividend distributions. The risks involved relate both to the underlying share (see 1.3 above) and to the bank issuing the Receipt.

**1.5 Penny Shares**

There is an extra risk of losing money when shares are bought in some smaller companies, including penny shares. There is a big difference between the buying price and the selling price of these shares. If they have to be sold immediately, you may get back much less than you paid for them. The price may change quickly and it may go down as well as up.

**2. Warrants**

A warrant is a time-limited right to subscribe for shares, debentures, loan stock or government securities and is exercisable against the original issuer of the underlying securities. A relatively small movement in the price of the underlying security could result in a disproportionately large movement, unfavourable or favourable, in the price of the warrant. The prices of warrants can therefore be volatile.

The right to subscribe for any of the investment products listed in 1 above or 3 or 4 below which a warrant confers is invariably limited in time with the consequence that if the investor fails to exercise this right within the predetermined time-scale then the investment becomes worthless.

If subscription rights are exercised, the warrant holder may be required to pay to the issuer additional sums (which may be at or near the value of the underlying assets). Exercise of the warrant will give the warrant holder all the rights and risks of ownership of the underlying investment product.

A warrant is potentially subject to all of the major risk types referred to in Part III below.

You should not buy a warrant unless you are prepared to sustain a total loss of the money you have invested plus any commission and/or other transaction charges.

Some other instruments are also called warrants but are actually options (for example, a right to acquire securities which is exercisable against someone other than the original issuer of the securities, often called a covered warrant). For these instruments, see 6.3 below.

### 3. Money-Market Instruments

A money-market instrument is a borrowing of cash for a period, generally no longer than six months, but occasionally up to one year, in which the lender takes a deposit from the money markets in order to lend (or advance) it to the borrower. Unlike in an overdraft, the borrower must specify the exact amount and the period for which it wishes to borrow. Like other debt instruments (see 4 below), money-market instruments may be exposed to the major risk types in Part III below, in particular credit and interest rate risk.

### 4. Debt Instruments / Bonds / Debentures

All debt instruments are potentially exposed to the major risk types in Part III below, in particular credit risk and interest rate risk.

Debt securities may be subject to the risk of the issuer's inability to meet principal and/or interest payments on the obligation and may also be subject to price volatility due to such factors as interest rate sensitivity, market perception of the creditworthiness of the issuer, general market liquidity, and other economic factors, amongst other issues. When interest rates rise, the value of corporate debt securities can be expected to decline. Fixed-rate transferable debt securities with longer maturities tend to be more sensitive to interest rate movements than those with shorter maturities.

### 5. Units in Collective Investment Schemes

Collective investment schemes and their underlying assets are potentially exposed to all of the major risk types referred to in Part III below.

There are many different types of collective investment schemes. Generally, a collective investment scheme will involve an arrangement that enables a number of investors to 'pool' their assets and have these professionally managed by an independent manager. Investments may typically include gilts, bonds and quoted equities, but, depending on the type of scheme, may go wider into derivatives, real estate or any other asset. There may be risks on the underlying assets held by the scheme and investors are advised, therefore, to check whether the scheme holds a number of different assets, thus spreading its risk. Subject to this, investment in such schemes may reduce risk by spreading the investor's investment more widely than may have been possible if he or she was to invest in the assets directly.

The reduction in risk may be achieved because the wide range of investments held in a collective investment scheme can reduce the effect that a change in the value of any one investment may have on the overall performance of the portfolio. Although, therefore, seen as a way to spread risks, the portfolio price can fall as well as rise and, depending on the investment decisions made, a collective investment scheme may be exposed to many different major risk types.

### 6. Derivatives, including Options, Futures, Swaps, Forward Rate Agreements, Derivative Instruments for the Transfer of Credit Risk, Financial Contracts for Differences

The risks set out in 6.1 - 6.5 below may arise in connection with all types of derivative contract, whether it is in the form of a listed instrument, an OTC instrument, or a securitised product such as a note or a certificate.

#### 6.1 Derivatives generally

A derivative is a financial instrument, the value of which is derived from an underlying asset's value. Rather than trade or exchange money, assets or some other value at some future date based on the underlying asset. A premium may also be payable to acquire the derivative instrument.

There are many types of derivative, but options, futures and swaps are among the most common. An investor in derivatives often assumes a high level of risk, and therefore investments in derivatives should be made with caution, especially for less experienced investors or investors with a limited amount of capital available to invest.

Derivatives usually have a high risk connected with them, predominantly as there is a reliance on the performance of underlying assets, which is unpredictable. Options or futures can allow a person to pay only a premium to have exposure to the performance of an underlying asset, and while this can often lead to large returns if the investor has made correct assumptions with regard to performance, it could lead to a 100% loss (the premium paid) if incorrect. Options or futures sold "short" or uncovered (i.e. without the seller owning the asset at the time of the sale) may lead to great losses if, depending on the nature of the derivative, the price of the underlying asset falls or rises significantly.

If a derivative transaction is particularly large or if the relevant market is illiquid (as may be the case with many privately negotiated off-exchange derivatives), it may not be possible to initiate a transaction or liquidate a position at an advantageous price.

On-exchange derivatives are subject, in addition, to the risks of exchange trading generally, including potentially the requirement to provide margin. Off-exchange derivatives may take the form of unlisted transferable securities or bi-lateral "over the counter" contracts ("OTC"). Although these forms of derivatives may be traded differently, both arrangements may be subject to credit risk of the issuer (if transferable securities) or the counterparty (if OTCs) and, like any contract, are subject also to the particular terms of the contract (whether a one-off transferable security or OTC, or a master agreement), as well as the risks identified in Part III below. In particular, with an OTC contract, the counterparty may not be bound to "close out" or liquidate this position, and so it may not be possible to terminate a loss-making contract.

Derivatives can be used for speculative purposes or as hedges to manage other investment risks. In all cases the suitability of the transaction for the particular investor should be very carefully considered. Derivatives carry a high degree of risk as a small deposit or down payment can lead to large losses as well as gains. It also means that a relatively small movement can lead to a proportionately much larger movement in the value of your investment, and this can work against you as well as for you.

You are therefore advised to ask about the terms and conditions of the specific derivatives and associated obligations (e.g. the circumstances under which you may become obligated to make or take delivery of an underlying asset and, in respect of options, expiration dates and restrictions on the time for exercise). Under certain circumstances, the specifications of outstanding contracts (including the exercise price of an option) may be modified by the exchange or Clearing House to reflect changes in the underlying asset.

Normal pricing relationships between the underlying asset and the derivative may not exist in all cases. This can occur when, for example, the futures contract underlying the option is subject to price limits while the option is not. The absence of an underlying reference price may make it difficult to assess 'fair' value.

The points set out below in relation to different types of derivative are not only applicable specifically to these derivatives but are also applicable more widely to derivatives generally. All derivatives are potentially subject to the major risk types in Part III below, especially market risk, credit risk and any specific sector risks connected with the underlying asset.

**6.2 Futures / Forwards / Forward rate agreements**

Transactions in futures or forwards involve the obligation to make, or to take, delivery of the underlying asset of the contract at a future date, or in some cases to settle the position with cash. They carry a high degree of risk. The 'gearing' or 'leverage' often obtainable in futures and forwards trading means that a small deposit or down payment can lead to large losses as well as gains. It also means that a relatively small movement can lead to a proportionately much larger movement in the value of your investment, and this can work against you as well as for you. Futures and forwards transactions have a contingent liability, and you should be aware of the implications of this, in particular margining requirements: these are that, on a daily basis, with all exchange-traded, and most OTC off-exchange, futures and forwards, you will have to pay over in cash losses incurred on a daily basis and if you fail to, the contract may be terminated. See, further, 1 and 2 of Part IV below.

**6.3 Options**

There are many different types of options with different characteristics subject to the following conditions.

Put option: a put option is an option contract that gives the holder (buyer) of the option the right to sell a certain quantity of an underlying security to the writer of the option at a specified price (the strike price) up to a specified date (the expiration date).

Call option: a call option is an option contract that gives the holder (buyer) the right to buy a certain quantity of an underlying security from the writer of the option, at a specified price (the strike price) up to a specified date (the expiration date).

Buying options: Buying options involves less risk than selling options because, if the price of the underlying asset moves against you, you can simply allow the option to lapse. The maximum loss is limited to the premium, plus any commission and/or other transaction charges. However, if you buy a call option on a futures contract and you later exercise the option, you must acquire the future. This will expose you to the risks described under 'futures' and 'contingent liability investment transactions'. Certain options markets operate on a margined basis, under which buyers do not pay the full premium on their option at the time they purchase it. In this situation, you may subsequently be called upon to pay margin on the option up to the level of your premium. If you fail to do so as required, your position may be closed or liquidated in the same way as a futures position.

Writing options: If you write an option, the risk involved is considerably greater than buying a option. You may be liable for margin to maintain your position (as explained in 6.2 above) and a loss may be sustained well in excess of the premium received. By writing an option, you accept a legal obligation to purchase or sell the underlying asset if the option is exercised against you, however far the market price has moved away from the exercise price.

If you already own the underlying asset which you have contracted to sell (known as 'covered call options') the risk is reduced. If you do not own the underlying asset (known as 'uncovered call options') the risk can be unlimited. Only experienced persons should contemplate writing uncovered options, and then only after securing full details of the applicable conditions and potential risk exposure.

Traditional options: Certain London Stock Exchange member firms under special exchange rules write a particular type of option called a 'traditional option'. These may involve greater risk than other options. Two-way prices are not usually quoted and there is no exchange market on which to close out an open position or to effect an equal and opposite transaction to reverse an open position. It may be difficult to assess its value or for the seller of such an option to manage his exposure to risk.

**6.4 Contracts for differences**

Certain derivatives are referred to as contracts for differences. These can be options and futures on the FTSE 100 index or any other index of an exchange, as well as equity, currency and interest rate swaps, amongst others. However, unlike other futures and options (which may, depending on their terms, be

settled in cash or by delivery of the underlying asset), these contracts can only be settled in cash. Investing in a contract for differences carries the same risks as investing in a future or an option as referred to in 6.2 and 6.3 above. Transactions in contracts for differences may also have a contingent liability.

**6.5 Swaps**

A swap is a derivative where two counterparties exchange one stream of cash flow against another stream. A major risk of old off-exchange derivatives (including swaps) is known as counterparty risk, whereby a party is exposed to the inability of its counterparty to perform its obligations under the relevant Financial Instrument. If party A, wants a fixed interest rate loan and so swaps a variable rate loan with another party, B, thereby swapping payments, this will synthetically create a fixed rate for A. However, if B goes insolvent, A will lose its fixed rate and will be paying a variable rate again. If interest rates have gone up a lot, it is possible that A will struggle to repay.

The swap market has grown substantially in recent years, with a large number of banks and investment banking firms acting both as principals and as agents utilizing standardised swap documentation to cover swaps trading over a broad range of underlying assets. As a result, the swap market for certain underlying assets has become more liquid but there can be no assurance that a liquid secondary market will exist at any specified time for any particular swap.

**7. Combined Instruments**

Any combined instrument, such as a bond with a warrant attached, is exposed to the risk of both those products and so combined products may contain a risk which is greater than those of its components generally, although certain combined instruments may contain risk mitigation features, such as principal protected instruments.

**PART III: Generic Risk Types**

**1. General**

The price or value of an investment will depend on fluctuations in the financial markets outside of anyone's control. Past performance is no indicator of future performance.

The nature and extent of investment risks varies between countries and from investment to investment. These investment risks will vary with, amongst other things, the type of investment being made, including how the financial products have been created or their terms drafted, the needs and objectives of particular investors, the manner in which a particular investment is made or offered, sold or traded, the location or domicile of the Issuer, the diversification or concentration in a portfolio (e.g. the amount invested in any one currency, security, country or issuer), the complexity of the transaction and the use of leverage.

The risk types set out below could have an impact on each type of investment.

**2. Liquidity**

The liquidity of an instrument is directly affected by the supply and demand for that instrument and also indirectly by other factors, including market disruptions (for example a disruption on the relevant exchange) or infrastructure issues, such as a lack of sophistication or disruption in the securities settlement process. Under certain trading conditions it may be difficult or impossible to liquidate or acquire a position. This may occur, for example, at times of rapid price movement if the price rises or falls to such an extent that, under the rules of the relevant exchange trading, is suspended or restricted. Placing a stop-loss order will not necessarily limit your losses to intended amounts, but market conditions may make it impossible to execute such an order at the stipulated price. In addition, unless the contract terms so provide, a party may not have to accept early termination of a contract or buy back the relevant product.

**3. Credit Risk**

Credit risk is the risk of loss caused by borrowers, bond obligors, or counterparties failing to fulfill their obligations or the risk of such parties' credit quality deteriorating.

**4. Market Risk**

**4.1 General**

The price of investments goes up and down depending on market supply and demand, investor perception and the prices of any underlying or allied investments or, indeed, sector and economic factors. These can be totally unpredictable.

**4.2 Overseas markets**

Any overseas investment or investment with an overseas element can be subject to the risks of overseas markets which may involve different risks from your home market. In some cases the risks will be greater. The potential for profit or loss from transactions on foreign markets or in overseas denominated contracts will be affected by fluctuations in overseas exchange rates.

**4.3 Emerging Markets**

Price volatility in emerging markets, in particular, can be extreme. Price discrepancies can be common and unpredictable movements in the market not uncommon. Additionally, as news about a country becomes available, the financial markets may react with dramatic upswings and/or downswings in prices during a very short period of time. Emerging markets generally lack the level of transparency, liquidity, efficiency, market infrastructure, and regulation found in more developed markets. For example, these markets might not have regulations governing manipulation and insider trading or other provisions designed to "level the playing field" with respect to the availability of information and the use or misuse thereof in such markets. They may also be affected by political risk. It may be difficult to employ certain risk and legal uncertainty management practices for emerging markets investments, such as forward currency exchange contracts or derivatives.

**5. Currency Risk**

In respect of any foreign exchange transactions and transactions in derivatives and securities that are denominated in a currency other than that in which your account is denominated, a movement in exchange rates may have a favourable or an unfavourable effect on the gain or loss achieved on such transactions.

The weakening of a country's currency relative to a benchmark currency or the currency of your portfolio will negatively affect the value of an investment denominated in that currency. Currency valuations are linked to a host of economic, social and political factors and can fluctuate greatly, even during intra-day trading. Some countries have foreign exchange controls which may include the suspension of the ability to exchange or transfer currency, or the devaluation of the currency. Hedging can increase or decrease the exposure to any one currency, but may not eliminate completely exposure to changing currency values.

**6. Interest Rate Risk**

Interest rates can rise as well as fall. A risk exists with interest rates that the relative value of a security, especially a bond, will worsen due to an interest rate increase. This could impact negatively on other products.

**7. Regulatory / Legal Risk**